# 24-1034(L), 24-1038(CON)

# United States Court of Appeals
### *for the*
## Second Circuit

VERNON HORN, MARQUIS JACKSON,

*Plaintiffs-Appellees,*

— v. —

PETISIA ADGER, LEE DEASE, Executor of the Estate of Leroy Dease,
DARYLE BRELAND, in their individual capacities,

*Defendants-Appellants,*

CITY OF NEW HAVEN, LEROY DEASE, JAMES STEPHENSON,
in their individual capacities,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR DEFENDANTS-APPELLANTS

THOMAS E. KATON
SUSMAN, DUFFY & SEGALOFF, P.C.
*Attorneys for Defendants-Appellants*
700 State Street, Suite 100
New Haven, Connecticut 06511
(203) 624-9830

COUNSEL PRESS    (800) 4-APPEAL • (624175)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT .........................................................1

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF ISSUES ................................................................4

STATEMENT OF THE CASE............................................................4

    I.      The Robbery and Murder .....................................................4

    II.     The Police Investigation .......................................................5

    III.    Butler's Stolen Cell Phone ...................................................8

    IV.   Interview with Pearson.........................................................8

    V.     Interview of Thompson ......................................................10

    VI.   "Bridgeport Crew" Leads Detectives to Steve Brown.......................12

    VII.   Identification of Horn and Jackson by Shaquan Pallet .......................14

    VIII.  Subpoenaed Phone Records ...............................................15

    IX.   Criminal Trial, Habeas Hearing, and State's Motion to Vacate the Conviction .......................................................16

    X.     Trial Court Summary Judgment Order ...............................17

SUMMARY OF ARGUMENT ..........................................................20

ARGUMENT ...................................................................................21

    I.      Standard of Review ............................................................21

    II.     The Doctrine of Qualified Immunity .................................21

    III.   The District Court Erred in Concluding that Defendants were not Protected by Qualified Immunity for Failing to Disclose their Interview Methods .......................................................25

i

A. The methods employed by the Defendant Detectives during their interviews of Pearson and Thompson were constitutionally permissive and did not violate their due process rights..................................................................25

    1. Pearson's Interviews......................................................29

    2. Thompson's Interviews ................................................31

B. The law was not clearly established that Defendants' interview methods, such as threatening to prosecute a family member or contact a probation officer, were unconstitutional at the time of the incident..............................32

IV. The District Court Improperly Concluded that Defendants were not Protected by Qualified Immunity for Not Disclosing Pearson and Thompson's off-the-record Statements ........................35

A. There was no clearly established law compelling Defendants to include Pearson and Thompson's initial denials in their police reports ....................................................36

B. Defendants' conduct was objectively reasonable under the circumstances ........................................................39

    1. Pearson's Interview ......................................................40

    2. Thompson's Interview ..................................................42

V. Defendants' Interview Methods do not Amount to Fabrication of Evidence.......................................................................44

A. Pearson's statement that he made the fourth call to Sykes using the cell phone.......................................................46

B. Brown's statement that he handed the phone to Horn after the third call ....................................................................47

C. Detectives' statements that Pearson's account of the fourth call was volunteered by him without threats..................48

D. Detectives' statements that Brown and Thompson identified the plaintiffs during nonsuggestive photo arrays .................................................................................48

VI. Defendants are Entitled to Qualified Immunity for Failure to Intervene ...............................................................................49

A.    The Detectives' interview methods and undisclosed statements did not violate clearly established law, and it was objectively reasonable under the circumstances for the Detectives to not intervene in the alleged constitutional violations ............................................................50

B.    The Detective Defendants did not have a reasonable opportunity to intervene such that they became tacit collaborators, and a reasonable officer would not have believed failing to intervene was unconstitutional ...................51

CONCLUSION .......................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ...........................................................22, 23, 24, 33

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ..................................................................22, 46

*Behrens v. Pelletier*,
  516 U.S. 299 (1996) ...........................................................................3

*Chavez v. Martinez*,
  538 U.S. 760 (2003) ...........................................................25, 26, 34, 46

*City & Cnty. of San Francisco v. Sheehan*,
  575 U.S. 600 (2015) ................................................................. 24-25

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ..................................................................26, 29

*Deshawn E. by Charlotte E. v. Safir*,
  156 F.3d 340 (2d Cir. 1998)..........................................................27, 34

*District of Columbia v. Wesby*,
  583 U.S. 48 (2017) ..............................................................................40

*Ferris v. City of Cadillac*,
  726 Fed. Appx. 473 (6th Cir. 2018)....................................................45

*Figueroa v. Mazza*,
  825 F.3d 89 (2d Cir. 2016)....................................................................51

*Fountain v. City of White Plains*,
  No. 13 CV 7016-LTS-FM, 2015 U.S. Dist. LEXIS 127456
  (S.D.N.Y. Sep. 23, 2015) ...................................................... 25-26, 32

*Grice v. McVeigh*,
  873 F.3d 162 (2d Cir. 2017)....................................................................36

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ..............................................................................21

*Heien v. North Carolina*,
  574 U.S. 54 (2014) ................................................................................25

iv

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007)................................................................33, 39

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ......................................................................22, 35

*Illinois v. Perkins,*
    496 U.S. 292 (1990) ............................................................................27

*Isaac v. City of New York*,
    2020 U.S. Dist. LEXIS 60380 (E.D.N.Y.) ...............................50, 51, 52

*Jeanty v. City of Utica*,
    2021 U.S. Dist. LEXIS 7737 (N.D.N.Y. 2021) ............................ 49-50

*Jennis v. Rood,*
    310 Fed. Appx. 439 (2d Cir. 2009)......................................................27

*Knighton v. Hartman*,
    2023 U.S. Dist. LEXIS 214906 (C.D. 2023)........................................49

*Lennon v. Miller,*
    66 F.3d 416 (2d Cir. 1995)..................................................................24

*Malley v. Briggs*,
    475 U.S. 335 (1986) .................................................22, 24, 40, 46

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2012)................................................................35

*Mara v. Rilling*,
    921 F.3d 48 (2d Cir. 2019)...........................................................*passim*

*Martinez v. Simonetti*,
    202 F.3d 625 (2d Cir. 2000)..................................................................3

*Messerschmidt v. Millender*,
    565 U.S. 535, 132 S. Ct. 1235 (2012) .................................................46

*Moran v. Burbine*,
    475 U.S. 412 (1986) ............................................................................28

*Morse v. Fusto*,
    804 F.3d 538 (2d Cir. 2015)................................................................45

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ................................................................................23

*O'Neill v. Krzeminski*,
   839 F.2d 9 (2d Dist. 1988) ...................................................................49

*O'Bert ex rel. Estate of O'Bert v. Vargo*,
   331 F.3d 29 (2d Cir. 2003) ....................................................................3

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .................................................................21, 24, 26

*Plumhoff v. Rickard*,
   572 U.S. 765 (2014) ........................................................................23, 25

*Poe v. Leonard*,
   282 F.3d 123 (2d Cir. 2002) ................................................................40

*Reichle v. Howards*,
   566 U.S. 658 (2012) ....................................................................... 22-23

*Rhodes v. Tevens,*
   2012 U.S. Dist. LEXIS 30290 (W.D.N.Y. Mar. 7, 2012) ....................27

*Ricciuti v. New York Transit Auth.*,
   124 F.3d 123 (2d Cir. 1997) ................................................................50

*Rochin v. California*,
   342 U.S. 165 (1956) ......................................................................26, 46

*Royal Crown Day Care v. Department of Health*,
   746 F.3d 538 (2d Cir. 2014) ................................................................21

*Salim v. Proulx*,
   93 F.3d 86 (2d Cir. 1996) ......................................................................4

*Saucier v. Katz*,
   533 U.S. 194 (2001) ....................................................................*passim*

*Sloley v. Vanbramer*,
   945 F.3d 30 (2d Cir. 2019) ..................................................................49

*State v. Jackson, et al.,*
   73 Conn. App. 338 (2002) ...................................................................16

*State v. Johnson*,
   288 Conn. 236 (2007) ...........................................................37, 38, 39

*Tierney v. Davidson*,
   133 F.3d 189 (2d Cir. 1998) ..................................................................4

*Tinker v. Beasley,*,
    429 F.3d 1324 (11th Cir. 2005)................................................................28, 31, 34

*United States v. Agurs,*
    427 U.S. 97 (1976) ................................................................36

*United States v. Alvarado,*
    882 F.2d 645 (2d Cir. 1989)................................................................31, 34

*United States v. Amiel,*
    95 F.3d 135 (2d Cir. 1996)................................................................36

*United States v. Brimage,*
    115 F.3d 73 (1st Cir. 1997) ................................................................39

*United States v. Diaz,*
    922 F.2d 998 (2d Cir. 1990)................................................................36

*United States v. Guarno,*
    819 F.2d 28 (2d Cir. 1987)................................................................46, 47

*United States v. Mullens,*
    536 F.2d 997 (2d Cir. 1976)................................................................34

*United States v. Ruggles,*
    70 F.3d 262 (2d Cir. 1995)................................................................31, 34, 35

*United States ex rel. Lathan v. Deegan,*
    450 F.2d 181 (2d Cir. 1971)................................................................31

*Walczyk v. Rio,*
    496 F.3d 139 (2d Cir. 2007)................................................................24

*White v. Pauly,*
    580 U.S. 73 (2017) ................................................................23, 24, 36

*Wilson v. Layne,*
    526 U.S. 603 (1999) ................................................................22

**Statutes & Other Authorities:**

U.S. Const. Amend. IV ..............................................................23

U.S. Const. Amend. V ..............................................................25

U.S. Const. Amend. XIV .....................................................26, 31

28 U.S.C. § 1331 ........................................................................2

42 U.S.C. § 1983 ........................................................2, 17, 21, 27

## PRELIMINARY STATEMENT

Defendants, Estate of Leroy Dease ("Dease"), Petisia Adger ("Adger") and Daryle Breland ("Breland") (collectively "Defendants" or "Detective Defendants"), appeal the final ruling of the trial court (Chatigny, R.) on March 19, 2024, denying summary judgment. (SPA 52-104, 107-59). Defendants further appeal the trial court's order dated August 8, 2024, reconsidering a grant of summary judgment for a specific count in both matters. (SPA 105-6, 160-61).

The appeal is based on qualified immunity for claims in which the court denied the defense.

## STATEMENT OF JURISDICTION

This consolidated appeal involves two cases pending in the United States District Court, District of Connecticut: (1) *Vernon Horn v. City of New Haven, et al.*, 18 CV 1502; and (2) *Marquis Jackson v. City of New Haven, et al.*, 19 CV 0388. The cases stem from a robbery and murder which occurred on January 24, 1999, in New Haven, and the subsequent investigation by Detective Defendants leading to the Plaintiffs' arrests and convictions, which were ultimately vacated. Vernon Horn ("Horn") filed suit on September 7, 2018. (A 52-109). Marquis Jackson ("Jackson") filed suit on March 13, 2019. (A 549-94). The cases were consolidated for discovery and summary judgment. (A 110-11).

Horn and Jackson filed amended complaints (A 112-75, 595-647), which, relevant to this appeal, contained four counts alleging violations under 42 U.S.C. § 1983. As such, the district court had federal question subject manner jurisdiction under 28 U.S.C. § 1331.

On June 14, 2021, Defendants moved for summary judgment (A 176-77, 648-49) arguing, in part, that the doctrine of qualified immunity barred Plaintiffs' § 1983 claims.

The trial court's (Chatigny, R.) ruling on summary judgment came in multiple parts. The court provided partial oral rulings during a hearing on November 13, 2023, but requested further briefing on certain matters. (SPA 1-51). The court's November 13th ruling was not final for purposes of appeal. (SPA 49:17-50:3).

On March 19, 2024, the court issued its final order granting in part and denying in part summary judgment. (SPA 52-104, 107-59). The Court denied qualified immunity for certain counts. (SPA 79-80, 134-35).

Defendants timely filed notices of appeal on April 18, 2024, as to the denial of qualified immunity. (A 475-79, 986-91). Thereafter, on August 8, 2024, the district court, upon Plaintiffs' motions to reconsider (A 474, 984-85), vacated its partial grant of summary judgment on a § 1983 claim alleging fabrication of evidence. (SPA 105-6, 160-61). By doing so, the trial court, in effect, denied Defendants' defense of qualified immunity for that claim.

Defendants filed amended notices of appeal on August 20, 2024, adding the court's denial of qualified immunity that resulted from its August 8th order to this appeal. (A 488-93, 992-97).

The *Horn* and *Jackson* matters have been consolidated for purposes of this appeal. [*Horn*, App. Dckt. 24.1; *Jackson*, App. Dckt. 19.1]. The trial court's orders in *Horn* and *Jackson* are identical. **Moving forward, Defendants refer to the more-complete *Horn* orders, which are included in their Appendix.**

This Court has jurisdiction pursuant to the collateral order doctrine. Ordinarily, "the denial of a motion for summary judgment is not immediately appealable because such a decision is not a final judgment." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003). Interlocutory appeals are encouraged in qualified immunity cases because the issue should be resolved early in the proceedings since it protects an officer from suit. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

A denial of qualified immunity is immediately appealable if the denial turns on an issue of law. *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Martinez v. Simonetti*, 202 F. 3d 625, 632 (2d Cir. 2000). Defendants do not contest the district court's finding of material issues of disputed facts but argue they are nonetheless entitled to qualified immunity as a matter of law. Therefore, the Court has

jurisdiction to hear this appeal. *Salim v. Proulx*, 93 F.3d 86, 90-91 (2d Cir. 1996); *Tierney v. Davidson*, 133 F3d 189, 194 (2d Cir.1998).

## STATEMENT OF ISSUES

1)      Does qualified immunity bar Plaintiffs' claims that Dease and Breland violated *Brady* by not disclosing their interview methods of Marcus Pearson and Kendall Thompson as well as the witnesses' initial denials?

2)      Does qualified immunity bar Plaintiffs' claims of fabrication of evidence by Detective Defendants regarding various witness statements and Defendants' own statements as to the specific circumstances regarding witness identifications made during interviews?

3)      Does qualified immunity bar Plaintiffs' claims that Defendants failed to intervene during alleged constitutional violations?

## STATEMENT OF THE CASE[1]

### I.      The Robbery and Murder

On January 24, 1999, at approximately 3:26 a.m., three armed, masked men entered Dixwell Deli ("Deli") located on Dixwell Avenue in New Haven. (A 120, 204, 598). The robbers wore masks that obscured their faces. (A 204). The first

---

[1] For Purposes of appeal, Defendants have relied on both undisputed facts and the Plaintiffs' facts pursuant to *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998). While this brief assumes the Plaintiffs' facts as true, Defendants do not concede any of these facts in the underlying case in the District Court

gunman opened fire killing customer Caprice Hardy (A 120, 204, 598). Abby Yousif, co-owner of the Deli, was wounded and played dead throughout the robbery. *Id*. Vernon Butler ("Butler"), an employee, was asleep in the backroom but awoken by the shots. (A 204). Two gunmen kicked in the door leading to the backroom. *Id*. One gunman hit Butler on the head with the gun, threw him on the floor, and demanded the location of the money. *Id*. A gunman took Butler's prepaid Omnipoint cellular phone. *Id*.

During the robbery, Kendall Thompson ("Thompson") entered the Deli with a dollar in his hand. A gunman near the door pointed a gun at him, ordered him to the floor, and took the dollar. (A 348-49).

The gunmen could not open the cash register. (A 120). A gunman yelled, "Get the n***a in the back." (A 204). Another gunman grabbed Butler and walked him to the cash register. *Id*. Butler tried to open the register but could not. *Id*. The robbers heard sirens and fled. *Id*. After the robbers left, Butler called 911 at 3:32 a.m. (A 205).

## II. The Police Investigation

Three New Haven Police Department ("NHPD") detectives led the investigation: Detectives Dease (a 30-year veteran), Breland (a 10-year veteran), and Adger (a 7-year veteran). (A 205).

No physical evidence tied Horn or Jackson to the crime. *Id*. Horn and Jackson were at the Deli earlier that night, and Horn, according to Plaintiffs, was also at the Deli shortly after the murder where he was interviewed. (A 200-1). On January 24, 1999, Regina Wolfinger, a witness parked outside the Deli during the robbery, told Dease that two light skinned men came out of the Deli and lingered outside for "maybe two minutes," before leaving. (A 206). She was shown a picture of Horn and asked if she had seen him outside the Deli. Wolfinger responded: "possibly, yes he looks pretty familiar." *Id*.

On January 25, 1999, Dease interviewed Horn who reluctantly came to the station. (A 361). Horn claimed that, on the night of the robbery/murder, he and Jackson went to a club in downtown New Haven at 11:00 p.m., leaving when it closed at 2:00 a.m. *Id*.

That same night, Jackson met his girlfriend, Tesha Smith ("Tesha"), at the club and planned on spending the night with her. *Id*. Horn drove Jackson to a diner, but they decided not to eat. They then drove past a party and saw Zaneta Cooper ("Zaneta", a/k/a Zaneta Berryman) who got in the car with them. *Id*.

At approximately 2:45 a.m., the three began to drive to the Deli. (A 362). Horn and Jackson entered the Deli. Horn bought a soda, loose cigarettes, and condoms. Jackson got change for a dollar and went across the street to use a payphone to call his girlfriend Tesha. (A 363). When Horn exited the Deli, he saw Marcus Pearson

("Pearson"). (A 200, 363) Pearson had an ongoing sexual relationship with Zaneta at the time. (A 363-64). An employee of the Deli heard Horn say to Pearson something to the effect of "I will probably see you later." *Id*.

Thereafter, Horn, Jackson and Zaneta drove to a house where Jackson was renting a room. (A 363-64). Horn and Zaneta went inside, and Jackson went to meet Tesha. (A 364). Zaneta received a page from Pearson and called him at 3:30 a.m. (A 200-1). Horn agreed to walk Zaneta back to the Deli to meet Pearson. (A 201). They arrived at the Deli and learned that there had been a shooting. Both were interviewed by the police immediately after the robbery. (A 201-2).

Pearson lived at 31 Elizabeth Street in New Haven. (A 206). Pearson had a criminal history notable for theft and drug dealing. (A 450). He had served two years in prison and had one year remaining on his probation. *Id.* On January 25th (the day after the robbery), Horn and his cousin Sholanda Jenkins visited Pearson at his home at approximately 11:00 am. (A 206).

Detectives interviewed Pearson several times during their investigation. On January 26th, Breland interviewed Pearson. (A 378). Pearson admitted he was at the Deli and talked to someone though he could not recall whom. *Id*. Pearson confirmed he returned home from the Deli and received calls from Zaneta with Horn on the line at 3:30 a.m., although Pearson testified that the call could have been as late as 3:45. (A 201, 365).

7

### III. Butler's Stolen Cell Phone

A week after the robbery/murder, NHPD obtained a call detail record for Butler's stolen phone. (A 207). The detail showed five outgoing calls within 36 hours after the robbery. *Id*.

The fourth call was made to the address of 59 Ivy Street in West Haven. (A 208). On February 2nd, Dease, Breland, and Adger travelled there meeting a woman named Crystal Sykes ("Sykes"), a nurse's aide who took care of a husband and wife who lived there. *Id*. Sykes had no memory of receiving a telephone call from anyone at the time in the call detail but agreed to continue the interview at the police department. (A 209).

Detectives and Sykes went to the police department where Dease and Breland interviewed her. *Id*. Detectives showed Sykes the stolen phone record. *Id*. Sykes continued to claim she could not recall. *Id*. After a ten-minute pre-interview, Sykes gave a transcribed statement responding "yes" to Dease's question, "Ms. Sykes, so you're telling me that it's a good possibility that Marcus Pearson may have called you around [11:00] on 1/25/99?" (A 210, 376).

### IV. Interview with Pearson

On February 3, 1999, the day after Dease and Breland interrogated Sykes, they interviewed Pearson at the station. (A 212). They started with a pre-interview

during which Dease and Breland told Pearson that Horn had a cell phone (i.e., Butler's stolen phone), and that Pearson used Horn's phone to call Sykes who verified such. *Id*. Pearson repeatedly told the Detectives there was no phone. (A 212-13).

Detectives told Pearson if he did not tell them what they wanted to hear, he would be charged. (A 213). According to Plaintiffs, they "essentially" told Pearson to say he used the phone, or he was facing charges of robbery and murder. *Id*. They informed Pearson that he was a suspect, fit the description of one gunman, and either Pearson or Horn would be charged. *Id*. Breland admitted there was no reason to arrest Pearson. (A 214).

Detectives also told Pearson he would lose his kids if he did not admit to using the phone. *Id*. Pearson testified Dease and Breland instructed Pearson's probation officer to tell him, "If you don't cooperate then I'm going to violate your probation and let DCF know they have custody of your children." *Id*. Pearson also testified Dease and Breland threatened to charge Pearson's mother with perjury. *Id*.

The Detectives had Pearson provide a tape-recorded statement that cannot be found. (A 214-16). Pearson admitted that he called Sykes from his porch (in New Haven) after Horn lent him a cell phone because he was upset that Horn said he had been with Pearson's girlfriend, Zaneta, and that he (Pearson) wanted to show Horn he had another girlfriend (Sykes). (A 379).

When the February 3rd tape could not be found, Breland went to Pearson's house to repeat the interview on February 5, 1999. (A 384). Pearson repeated that Horn lent him a cell phone on his porch, which he used to call Sykes. *Id.*

Detectives did not disclose Pearson's initial denials regarding the phone or their interview methods, including the threats. (A 217-18). Breland admitted that Pearson initially stated that he did not call Sykes. (A 217). Breland did not speak with the prosecutor about the case and did not share what happened in the pre-interviews. (A 216-17). Pearson's denial that he called Sykes is not expressly noted in any police report. *Id.* Dease noted in a November 9, 1999 report, which was disclosed, that Pearson was "reluctant" to identify Horn as the person that lent him the cell phone. (A 384, 829).

## V.    Interview of Thompson

Thompson, a 19-year-old with an extensive criminal record who was on adult probation, walked into the Deli when the gunmen were present. (A 218). After two of the gunmen went to the backroom, he left the scene with a friend who was waiting outside in a car and went to his friend's home without calling the police. (A 458).

On January 26, 1999, Dease and Breland interviewed Thompson at his home after discovering from a friend of Thompson, Shamar Madden, that Thompson had been present at the robbery. *Id.* Thompson "didn't want to talk…didn't want to have

nothing to do with it." (A 219). Dease and Breland threatened to return with a warrant if Thompson did not come to the station. *Id*.

Thompson was brought to the station and placed in a "very small room with bright lights." Thompson was not told he could contact a lawyer or leave. *Id*. He remained at the station for about two hours. *Id*.

Dease and Breland conducted an untaped pre-interview. *Id*. Dease took notes during the pre-interview, but they were never disclosed. (A 219, 222-23) During the pre-interview, Dease and Breland showed Thompson two photographs of Horn and Jackson and repeatedly asked Thomspon, "Do these eyes match the eyes that you seen?" Thompson responded, "No." (A 220)

Thompson told the Detectives that the robbers wore masks, and he could not describe their appearance. *Id*. Thompson claimed he could not identify the gunmen about 18 times. *Id*. Dease threatened to call Thompson's probation officer if he did not cooperate. *Id*.

Detectives believed Horn's eyes had a yellow shade and described such to Thompson. (A 220-21). Eventually, Thompson pointed to Horn's eyes and mouth indicating they were similar to one gunman but did not indicate that he had seen Horn in the Deli. (A 460). Thompson later testified that the Detectives manipulated him into testifying at the criminal trial that the robbers had yellow eyes. (A 221).

11

During the pre-interview, Detectives created a written statement for Thompson to sign, but Thompson refused. (A 221). Detectives told Thompson that all he had to do is initial Horn and Jackson's photos without an explanation. *Id*. Thompson initialed the photos but informed the Detectives that he did not mean anything by it. *Id*.

Detectives turned on the tape recorder to record a statement. Thompson claims that they kept starting and stopping the tape during the interview. *Id*. Detectives also rewound the tape about ten times. *Id*. The recording has disappeared. *Id*. Thompson refused to sign the transcript of the recording. *Id*. After two hours, Detectives let Thompson leave the station. *Id*.

Breland admitted that Thompson could not identify Horn or Jackson. (A 222). Thompson's denials were never disclosed to the prosecution nor were Dease's threats to call Thompson's probation officer. (A 223).

Notably, at the criminal trial, Thompson testified that he was not "100 percent sure" of his identification, and that he could not say Horn and Jackson were the robbers. (A 461). He further testified that the police officers did not pressure him. Thompson believes he told the truth at the criminal trial. *Id*.

## VI.    "Bridgeport Crew" Leads Detectives to Steve Brown

Detective Defendants' investigation involved numerous interviews of witnesses and/or associates of witnesses in Bridgeport. Plaintiffs have identified

12

these individuals as the "Bridgeport Crew". (A 136, 568). Their interviews do not form the bases of Plaintiffs' constitutional violations and are therefore not relevant to this appeal. However, some are referenced herein for context.

Again, Butler's stolen phone call detail log showed five calls were made after the murder to various persons - including Willie Sadler ("Sadler") a drug dealer in Bridgeport. (A 125, 134). Sadler was the recipient of the first and fifth phone calls. *Id*.

Dease and Adger interviewed Sadler regarding the calls. Sadler claimed he did not recall who had called him. (A 385-86). On March 4, they met with Sadler and William Newkirk ("Newkirk"), Sadler's friend. (A 386). During the interview, Sadler admitted that a "Steve" had called him. *Id*. "Steve" was the brother-in-law of another Bridgeport resident, Marlo Macklin ("Macklin"). Macklin was friends with Tamika Fuller, who had received the third call. *Id*. Detectives learned from Macklin that Steve's last name was "Brown." (A 387).

After obtaining Brown's photo, Dease confirmed his identification with Sadler. *Id*. Dease obtained Brown's fingerprints from the Bridgeport Police Department. Brown's fingerprints matched a latent print lifted from a cigar box in the office of the Deli. *Id*.

Detectives arrested Brown and brought him to the station on March 10, 1999. (A 224). A pre-interview was conducted. Brown identified Horn and Jackson as his

13

accomplices in his interview with the Detectives, at the criminal trial, and at a later habeas corpus hearing. *Id.* Brown provided details about his relationship to Plaintiffs and the robbery/murder. Relevant to this appeal, Brown indicated that he used Butler's phone to make three phone calls, but then gave the phone to Horn. (A 224-25). Plaintiffs do not deny that "Steve Brown was one of the killers" but insist that Brown's statements are the product of coaching and coercion. (A 135-39). Brown testified at the criminal trial and the habeas hearings. Brown never claimed he was coerced or provided facts about the investigation. (A 412, 416). "Arrest warrants were obtained for Horn and Jackson based principally on Brown's statement." (A 228, 230). Brown confessed to the robbery and pled guilty. (A 412). Brown has never recanted his identification of Horn or Jackson.

## VII. Identification of Horn and Jackson by Shaquan Pallet[2]

Shaquan Pallet, a friend of victim Hardy, was outside the Deli before and during the murder and saw two of the three perpetrators. (A 417-18). Pallet was arrested a day after Horn's arrest for an unrelated crime and was interviewed by Dease and Assistant State's Attorney Gary Nicholson. (A 420). During the interview, Pallet identified Horn and Jackson. (A 420-21). Plaintiffs' motion to

---

[2] Pallet's statement referenced for context. The district court has found that, as a matter of law, the Defendants' dealings with Pallet do not amount to a constitutional violation. (SPA 40-41, 74)

14

suppress Pallet's identification was denied. (A 421). Pallet testified at the criminal trial consistent with his statement; however, he admitted that, while incarcerated, he wrote a note recanting his identification after feeling threatened. (A 421-22). Jackson's lawyer objected to the note. (A 422).

## VIII. Subpoenaed Phone Records

During the investigation, Detectives subpoenaed phone records associated with Butler's stolen phone as well as various witnesses involved in the investigation, including members of the "Bridgeport Crew." (A 423). Plaintiffs allege Defendants hid these records, but they do not dispute that some of these records were in the NHPD Records Division as late as 2018. (A 430-31). It is undisputed that Adger examined these records and prepared charts regarding the records, and it is further undisputed that her ongoing investigative work regarding these records ended after Brown identified Horn and Jackson and warrants were issued for their arrests. (A 434-36).

On January 31, 2018, after being contacted by the Federal Defender's Office during its review of the convictions, Adger provided documents from the investigation including 137 pages of the subpoenaed phone records that she had obtained and partially reviewed. (A 147-48).

### IX. Criminal Trial, Habeas Hearing, and State's Motion to Vacate the Conviction

Horn and Jackson were convicted after criminal trials and sentenced to 75 and 45 years respectively. Horn and Jackson directly appealed their convictions. *See State v. Jackson, et al.,* 73 Conn. App. 338 (2002). They alleged, in part, that the trial court erred in failing to suppress the identifications made by various witnesses including, relevant to this appeal, Brown's identification. *Id.* at 340. The Appellate Court affirmed the trial court's denial of the motion to suppress Brown's identification, finding that the photo array was not suggestive and that Brown's identification was reliable. *Id.* at 379-83.

Horn was briefly released in 2014 after a grant of habeas relief for ineffective assistance of counsel. (A 147). However, in 2016, the Connecticut Supreme Court reinstated his conviction. *Id.*

In 2017, the Federal Public Defender filed a habeas petition citing new evidence. (A 147-48). The petition observed that the phone detail of the five calls had a column labeled "ORIG" that identified the cell tower in closest proximity to where the calls were made. (Pet'r's Mem. Providing Factual and Procedural Background in Advance of Status Conf., No. 3:17-cv-0164-JAM (D. Conn. Apr. 2, 2018), ECF No. 25). An FBI agent confirmed that the "ORIG" column plus additional information established that the calls from the stolen cell phone were made from Bridgeport precluding the possibility that Pearson called Sykes from his

16

porch in New Haven the day after the murder. (A 151-52). This was "new evidence" and neither the police, prosecutors, judges, nor the defense attorneys appreciated the meaning of the "ORIG" column in the call detail records. (A 448-49).

## X.    Trial Court Summary Judgment Order

Plaintiffs allege four counts under 42 U.S.C. § 1983 against Defendants: (Count I) *Brady* violations for withholding exculpatory evidence, (A 156-57, 631); (Count II) fabrication of evidence, (A 157-58, 632-33); (Count III) unreasonably prolonged detention, (A 158-59, 633-34), and (Count IV) failure to intervene, (A 159-60, 634-35). Defendants moved for summary judgment on all counts.

As to Count I, Plaintiffs alleged that Defendants acted with "specific intent" in withholding the 137 pages of exculpatory phone records (despite ultimately being turned over by Adger). The district court found that Plaintiffs also stated *Brady* violations for Defendant Dease and Breland's interactions with Thompson and Pearson. As to Thompson, the court found the following matters were undisclosed: (1) Breland's threat to call Thompson's probation officer if he failed to cooperate; (2) Thompson's repeated statements that he could not make an identification; (3) the Detectives' insistence that Thompson could see the robber's eyes and mouth; and (4) Dease's persistent demands that Thompson look closely at Horn's photo, especially the eyes. (SPA 77-78). As to Pearson, the following matters were undisclosed: (1) Pearson's denials that he used the stolen phone to call Sykes; and

17

(2) the Detectives' explicit threats, including, the threat to charge Pearson with murder unless he said he got the phone from Horn. (SPA 76).

Count II alleges that the Defendants fabricated evidence – specifically by coercing various witnesses to make statements that were false. (A 157-58, 632-33).

Count III alleges unreasonably prolonged detention. (A 158-59, 633-44).

Count IV alleges a failure to intervene – specifically that, "to the extent that they were not directly responsible for the withholding of exculpatory evidence, fabrication of evidence and unreasonably prolonged detention", Dease, Breland and Adger failed to intervene to prevent the misconduct of others. (A 159-60, 634-35).

The district court initially granted summary judgment as to Counts II and III but denied summary judgment on Counts I and IV finding, in part, that qualified immunity was not applicable. (SPA 2-3).

As to Count II, the Court found that the evidence was insufficient to raise a genuine issue on the element of knowing falsity – i.e., that Defendant Detectives knew that statements obtained from witnesses were false. The court stated:

> "A fabrication claim against an officer differs significantly from a claim that the officer used improper methods to obtain evidence. As the Seventh Circuit has stated:
>
> 'Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.' [citations omitted].

18

Stated differently, it is one thing for a detective to use improper tactics to pressure a witness to provide a statement that may be true and the witness believes to be true. It is another to use such tactics to force a witness to provide a statement that is false and known to be false by both the detective and the witness. Only the latter provides a basis for a fabrication claim." (SPA 38-39).

The trial court determined that the evidence did not show that Defendant Detectives had any reason to believe that the statements obtained from witnesses were false or that Detectives "created and forwarded to the prosecutor specified evidence likely to influence the jury's verdict, know the evidence was false." (SPA 30).

However, the court reconsidered its grant of summary judgment on Count II as to certain "fabricated evidence". The court found that a triable issue of fact existed as to Detectives' alleged knowledge of the falsity of the following statements: (1) Pearson's statement that he made the fourth call (i.e., call to Sykes) using the cell phone; (2) Brown's statement that he handed the phone to Horn after the third call; (3) statements by the Detectives that Pearson's account of the fourth call was volunteered by him without threats; and (4) statements by the Detectives that Brown and Thompson identified the plaintiffs in the course of nonsuggestive photo arrays. (SPA 105-6). In doing so, the court, though not specifically addressed, denied Defendants' defense of qualified immunity as to the fabrication of evidence count.

## SUMMARY OF ARGUMENT

In *Saucier v. Katz*, 533 U.S. 194 (2001) the Supreme Court mandated a two-step sequence for resolving qualified immunity. First, a court must decide whether the facts constitute a violation of a constitutional right. Second, the court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* at 201.

Here, the district court did not properly analyze the prongs of qualified immunity. There are no United States Supreme Court or Second Circuit Court of Appeals cases that would have put Detective Defendants on notice that under the specific circumstances at the time that their actions, specifically interview methods and dealings with witnesses, would violate Plaintiffs' constitutional rights. The absence of clearly established law entitles Defendants to qualified immunity.

Given the undisputed facts, competent officers could have believed the decisions of the Defendants made during their interviews of Pearson, Thompson, and Brown were reasonable, and they would not have known that they were violating Plaintiffs' constitutional rights. In turn, such techniques do not amount to fabrication of evidence, and officers in the Defendants' positions would not have objectively believed that their conduct amounted to a constitutional violation. This appeal requests that this Court afford the Defendants their fundamental right to have the qualified immunity analysis, as set forth in Section II, properly applied to the alleged

20

*Brady* violations (Sections III and IV), fabrication of evidence (Section V) and failure to intervene under § 1983 (Section VI) claims.

## ARGUMENT

### I. Standard of Review

Detective Defendants argue on appeal that, accepting Plaintiffs' allegations, they are entitled to qualified immunity as a matter of law. *Royal Crown Day Care v. Department of Health*, 746 F.3d 538, 543 (2d Cir. 2014). The standard of review is *de novo*. *Id*.

### II. The Doctrine of Qualified Immunity

The doctrine of qualified immunity shields government officials from liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity is immunity from suit rather than a mere defense to liability and therefore should be resolved at the earliest possible stage. *Id.* at 231 (internal quotations omitted); *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

In *Saucier v. Katz*, the Supreme Court established a two-prong inquiry for resolving a qualified immunity defense. 533 U.S. at 200-201. First, a court must consider whether the facts alleged show the officer's conduct violated a constitutional right. *Id.* at 201. If the first prong is satisfied, the court must then determine whether the right at issue was "clearly established" at the time of the conduct. *Id.* Specifically, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, summary judgment based on qualified immunity is appropriate if the law "did not put the officer on notice that his conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202; *see also, Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-742 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, (1999)). It is not enough that the rule is suggested by then-existing precedent. Rather, the precedent must be clear enough that every reasonable official would interpret it to establish the rule the plaintiff seeks to apply. *See Reichle v. Howards*, 566 U.S. 658,

666 (2012). Otherwise, the rule is not one that "every reasonable official" would know. *Id*. at 664 (internal quotations omitted).

The "clearly established" standard also requires that the legal principle prohibits the officer's conduct in the circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). In fact, the Supreme Court has repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Specificity requires that courts "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U. S. 73, 79 (2017). Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Mullenix*, 577 U.S. at 11).

The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to every reasonable officer that his conduct was unlawful in the situation he confronted. *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). Even if the right was clearly established in certain respects, an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue ***in its particular factual context***." *Walczyk*, 496 F.3d at 154 (emphasis added). Accordingly, "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Anderson*, 483 U.S. at 641). "The objective reasonableness test is met – and the defendant is entitled to immunity – if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon*, 66 F.3d at 420 (citing *Malley v. Briggs*, 475 U.S. 335, 341, (1986)); *Walczyk*, 496 F.3d at 154.

"The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotations omitted). "This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S.

600, 612 (2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)). This is so because "[t]he Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *Sheehan*, 575 U.S. at 612 (quoting *Plumhoff*, 572 U.S. at 775). The reasonableness standard allows for some mistakes on the part of officers, affording them "fair leeway" while enforcing the law. *Heien*, 574 U.S. at 61. "The limit is that the mistakes must be those of reasonable men." *Id.*

III. **The District Court Erred in Concluding that Defendants were not Protected by Qualified Immunity for Failing to Disclose their Interview Methods.**

A. The methods employed by the Defendant Detectives during their interviews of Pearson and Thompson were constitutionally permissive and did not violate their due process rights.

Plaintiffs' *Brady* claims allege a violation of their procedural Fifth Amendment due process rights. However, no clearly established case law exists establishing a constitutional violation under the *particular factual context* that presents here regarding whether the interview methods were coercive and unconstitutional. As a result, qualified immunity bars Plaintiffs' claims.

Under the present facts, Plaintiffs' allegations that Defendants' coercive interview methods violated their procedural due process rights are tantamount to a substantive due process claim. *Chavez v. Martinez*, 538 U.S. 760, 787 (2003). *See also*, *Mara v. Rilling*, 921 F.3d 48, 78-81 (2d Cir. 2019); *Fountain v. City of White Plains*, No. 13 CV 7016-LTS-FM, 2015 U.S. Dist. LEXIS 127456, at *23 (S.D.N.Y.

Sep. 23, 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The case law addressing alleged Fourteenth Amendment constitutional violations stemming from alleged coercive interview methods supports a finding that not every reasonable officer would have understood that non-disclosure of the interview methods was unconstitutional.

In *Chavez*, the Supreme Court acknowledged that "unusually coercive police interrogation procedures" may violate the Due Process Clause of the Fourteenth Amendment, but only where the conduct "shocks the conscience." 538 U.S. at 787 (citing *Rochin v. California*, 342 U.S. 165, 172, (1956) (overturning conviction based on evidence obtained by involuntary stomach pumping)). During their investigation, the Detective Defendants understood that to be unconstitutional their interview methods needed to "shock the conscience".

The Supreme Court has generally advised that "[t]he sort of official action most likely to rise to the conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). For example, in *Chavez*, a plurality of the Supreme Court offered "police torture or other abuse" as the type of conduct that would be actionable as a substantive due process violation. 538 U.S. at 773. Similarly, this Circuit has held that in the context of interviewing witnesses, the methods used must be "so shocking, brutal, and inhumane that every reasonable police officer would be

compelled to recognize that they violated substantive due process." *Mara*, 921 F.3d at 82.

Because police officers are permitted to use some level of deception and persuasion during interrogations without infringing on constitutional protections, the alleged interrogation tactics must be truly "outrageous" to rise to the level of misconduct sufficient to constitute an actionable § 1983 claim. *See e.g.*, *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 348 (2d Cir. 1998) (interrogation of juveniles by detectives were "deceptive" but not "so coercive as to amount to a constitutional violation"); *Jennis v. Rood,* 310 Fed. Appx. 439 (2d Cir. 2009) (plaintiff failed to allege "coercive police interrogation amounting to outrageous government conduct" where he asserted that police attempted to question him in the hospital after he had been shot by officers four times and did not want to answer questions); *Illinois v. Perkins,* 496 U.S. 292, 297 (1990) ("[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns").

"Other courts have held that interrogations that involve shouting, vulgar language, and threats do not shock the conscious so long as the officer's conduct was not arbitrary and capricious or intended to inflict harm." *Rhodes v. Tevens,* 2012 U.S. Dist. LEXIS 30290, at *35 (W.D.N.Y. Mar. 7, 2012) (collecting cases); *see also Mara*, 921 F.3d at 78-81 (interrogation methods, including conveying benefits

of cooperation and false misrepresentations about the strength of evidence, were not so "outrageous or inhumane . . . brutal or extreme" as to violate substantive due process). Consequently, investigatory conduct that includes coercive techniques does not offend substantive due process absent particularly "outrageous or inhumane" circumstances, such as torture, physical harm, or extreme psychological coercion. *Id.* at 81.

For example, in *Moran v. Burbine,* the Supreme Court held that the failure of police to inform a murder suspect of telephone calls from an attorney, who had been asked by the suspect's sister to represent him, before interrogating the suspect and obtaining his *Miranda* waiver and confession, did not shock the conscience. 475 U.S. 412, 432 (1986). In *Tinker v. Beasley,* the plaintiff failed to state a claim of coercive interrogation in violation of her substantive due process rights where police convinced her to sign a *Miranda* waiver in the absence of her lawyer after telling her "she would never see her children again unless she confessed," her lawyer no longer represented her, and that she would be executed on the electric chair if she did not cooperate. 429 F.3d 1324, 1329 (11th Cir. 2005). The *Tinker* court found that, while the alleged police misconduct was "untoward and upsetting," it did not rise to a level that shocked the conscience or was "sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim." *Id.* (internal citations omitted).

The essential question is: If the interrogation methods in the above cited case law were constitutional, how would every reasonable officer conclude that the Detectives' interview methods were unconstitutional and therefore required disclosure? The clear answer is not every reasonable officer would conclude the interviews were unconstitutional and qualified immunity bars Plaintiffs' claims.

### 1. Pearson's Interviews

Detectives' interviews of Pearson were proper and not outrageous or "intended to injure in some way unjustifiable by any governmental interest." *Cty. of Sacramento*, 523 U.S. at 849. Prior to his deposition in these lawsuits, Pearson described unremarkable interviews with no objective "hallmarks" of coercion.

The interviews were short and during normal hours. Some of the interviews were at Pearson's home with family members present. Pearson was not physically harmed or threatened. He was not screamed at, placed in isolation, handcuffed, deprived of food, water, use of the bathroom or other creature comforts. Pearson never asked to stop an interview. He now claims he felt intimidated by the size of the interview room at the police station, but there is no evidence that the room was unreasonably small or different than interview rooms where police typically interview witnesses.

Years later, Pearson claims he felt pressured during his interviews to admit he made the phone call. Specifically, Pearson testified that Dease and Breland told him the following:

- "The evidence shows that either he [Horn] let you use it [the cell phone], or you took it from the crime scene. Which one is it?"

- That Horn gave him the cell phone to call Crystal Sykes because he and Sykes knew each other.

- That he admit that Horn let him use the phone or he was going to face charges of robbery and murder.

- That if he did not cooperate with the statement, his mother would be charged with perjury.

- That since his children's mother was in prison, if he was charged, the State would take his children and put them in foster care.

- That if he did not tell Dease and Breland what they wanted to hear, he was not going to walk out of the police station.

- That Dease and Breland brought up his probation.

Even if the accusations are true, they do not amount to a constitutional violation. Suspects are often in circumstances where their involvement in an alleged crime will negatively impact their life. Questioning a witness and making him aware of the possible consequences that could result and the benefits to be derived from

cooperation do not make such questioning coercive. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (holding that statements to the effect that it would be to a suspect's benefit to cooperate are "merely common sense factual observations" and are not improperly coercive); *United States v. Alvarado*, 882 F.2d 645, 649–50 (2d Cir. 1989) (holding that the agent's statements that defendant had a daughter and it would be in her interest to cooperate, cooperation would be brought to judge's attention and failure to cooperate could subject her to a 10–year prison sentence did not render confession involuntary). Similarly, this Circuit has recognized that "a mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances." *United States ex rel. Lathan v. Deegan*, 450 F.2d 181, 185 (2d Cir. 1971).

The conduct alleged by Pearson against the Defendants is far less egregious than the threats made by the officers in *Tinker*, which did not shock the conscious and comes nowhere near the torture or physical abuse threshold that courts have required for a Fourteenth Amendment claim. Rather, the interview methods used with Pearson fall soundly within the realm of constitutional interview strategies.

### 2. *Thompson's Interviews*

Plaintiffs' claims regarding Defendants' coercive tactics during Thompson's interviews have even less merit. Allegedly, Dease threatened to notify Thompson's probation officer if he did not cooperate with their investigation. As discussed in

Argument Section III A *supra*, it is not improper to discuss potential penalties and benefits to be derived from cooperation. *Mara*, 921 F.3d at 78-81. More importantly, Plaintiffs' theory of coercion is undercut by Thompson's own testimony that he was not intimidated by the Detectives during his interviews. Nothing suggests the Detective's conduct was unconstitutionally coercive or outrageous.

      B. <u>The law was not clearly established that Defendants' interview methods, such as threatening to prosecute a family member or contact a probation officer, were unconstitutional at the time of the incident.</u>

Qualified immunity bars claims if the Defendant's conduct was objectively reasonable under the circumstances. *Fountain v. City of White Plains*, No. 13 CV 7016-LTS-FM, 2015 U.S. Dist. LEXIS 127456, at *23 (S.D.N.Y. Sep. 23, 2015) (holding that even if interrogation conduct is shocking enough to violate the Constitution, defendants are still entitled to qualified immunity if "a reasonable official would not have understood on the basis of the case law at the time of the incident that the conduct violated a clearly established constitutional right"). It was not unreasonable for the Defendants to believe that their interview methods of Thompson and Pearson did not violate the constitution in 1999.

Significantly, the district court did not analyze whether case law in 1999 clearly established that the procedures utilized by the Defendants was unconstitutional, such that every reasonable police officer would know that the Defendants violated the Constitution. The district court incorrectly held that

"coercive interrogation methods" were not addressed by the parties and declined to evaluate the second prong of qualified immunity. (SPA 38-39, 82). If it had, the district court would have found that existing precedent has recognized the same interview methods utilized by the Defendants – such as threatening to charge Pearson's mother with perjury or threatening to contact Pearson and Thompson's probation officers – to be within constitutional norms especially given the timeframe and context.

In determining whether a particular right was clearly established at the time defendants acted, the Second Circuit considers three factors: "(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007). Even where the law is clearly established, "the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Id.* at 169-170 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

There are no Supreme Court or Second Circuit cases holding threats to prosecute a family member or contact a witness's probation officer during an

33

interrogation constitute outrageous conduct in violation of due process rights. *See Tinker,* 429 F.3d at 1327 (noting that the Supreme Court has "offered scant guidance as to what conduct shocks the conscience"); *United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976) ("no federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement").

While the Supreme Court has held that a plaintiff may state a claim for violation of substantive due process based on a coercive confession, the Court has suggested that only interrogation methods involving torture or physical harm violate substantive due process rights. *Chavez,* 538 U.S. at 773-74 (allegations of "police torture or other abuse that results in a confession" may violate the Due Process clause). Likewise, this Circuit has opined that the Due Process clause prohibits "fear, torture, or any other type of coercion" but has not expounded on what that "other type of coercion" might entail. *Deshawn E.,* 156 F.3d at 348.

There is no clearly established due process right to custodial interrogation free of verbal threats, and no such right was recognized when Thompson and Pearson were questioned in this case. In fact, the methods employed by Defendants were in line with common practices at the time of the interviews when trying to get the witness] to talk. (A 389, 464). *See also, Ruggles*, 70 F.3d at 265 (2d Cir. 1995); *Alvarado*, 882 F.2d at 649-50. While someone might find the alleged conduct to be

aggressive, reasonable officers could disagree as to whether it shocked the conscious or constituted an egregious deprivation of due process. Accordingly, Defendants are entitled to qualified immunity for Plaintiffs' claims concerning their non-disclosure of the interview methods employed with Pearson and Thompson.

### IV. The District Court Improperly Concluded that Defendants were not Protected by Qualified Immunity for Not Disclosing Pearson and Thompson's off-the-record Statements.

Qualified immunity is available to shield police officers from civil liability if "a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information [he] possessed." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2012) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). Thus, Defendants are entitled to receive the protections of qualified immunity for misconduct unless every reasonable officer would have known that the conduct violated a constitutionally protected right. Given the case law, it was objectively reasonable for the Defendants to believe that excluding Pearson and Thompson's initial denials from the police reports was acceptable. As such, the district court erred in denying Defendants qualified immunity.

A. <u>There was no clearly established law compelling Defendants to include Pearson and Thompson's initial denials in their police reports.</u>

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The district court did not analyze the second prong of qualified immunity and merely stated "[a]ny reasonable officer would have known that failure to reveal the off-the-record statements to the prosecutor would violate an officer's disclosure obligations under *Brady*." (SPA 81). However, there is no clearly established right requiring Detectives to disclose Pearson and Thompson's off-the-record statements in their police reports under the circumstances presented. Neither the district court nor Plaintiffs have "'identif[ied] a case where an officer acting under similar circumstances' was held to have acted unconstitutionally." *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Defendants' *Brady*-derived responsibility to turn over potentially exculpatory evidence has limits. There is no obligation to "communicate preliminary, challenged, or speculative information." *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (quoting *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990)); *See also United States v. Agurs*, 427 U.S. 97, 109 (1976) (finding no constitutional obligation to make a complete and detailed accounting of all police investigatory work on a case). From a practical standpoint, law enforcement cannot be expected

36

to memorialize every witness comment and interaction, which often in circumstances similar to those that present here, begins with a witness refusing to talk or stating that he does not have information.

In the same vein, police officers do not have an obligation to make a record of all interviews or interrogations with witnesses. *State v. Johnson*, 288 Conn. 236, 281 (2007). *Johnson* involved, among other things, federal due process claims based upon the police department's failure to make a record of its entire questioning of the state's key witness and is particularly instructive on the clearly established law in 1999. *Id.* at 270. The key witness was the only source of evidence to place the defendant at the crime scene. *Id.* at 271. However, the witness's version changed multiple times from his first interaction with the police department to his in-court testimony at the defendant's second trial. *Id.* For example, the witness initially told the police that he knew nothing about the crime and saw nothing unusual after leaving the victim's company. *Id.* The witness also denied seeing a gun. However, after hours of questioning, the witness identified a photograph of the defendant and told the police he saw defendant running from the scene. After the witness identified the defendant, the police asked him to make a formal statement, which they recorded. *Id.* at 272. The witness made a second audiotaped statement two days later, again identifying the defendant from a photographic array but also adding that he saw the defendant carrying a black handgun. *Id.*

At the defendant's first trial, the witness testified consistently with the statements. *Id.* Further, when asked why he had not initially identified the defendant to the police nor mentioned the gun, the witness testified that he initially withheld information because he feared the defendant. At the defendant's second trial, however, the witness recanted all his prior inculpatory statements and renewed his initial assertion that he never saw the defendant at the crime scene or with a gun. *Id.* at 272-273. The witness testified that he felt pressured by the police when questioned and that his statements were compelled. *Id.* at 273. Specifically, the witness was afraid that if he did not give the police information, he would jeopardize his probationary status. All the witness's prior inconsistent statements were admitted at trial. *Id.*

When analyzing the defendant's due process claims, the Connecticut Supreme Court first noted that evidence of the witness's off-the-record statements was presented at trial; therefore, the defendant's due process claims stemmed from the police department's failure to preserve "some form of 'objective evidence' like notes or a recording of the entirety of the questioning." *Id.* at 275 n.39. The court then surveyed case law from the Supreme Court, federal and state courts and concluded that there is no "affirmative duty to create evidence or to record the entirety of communications with witnesses." *Id.* at 278-280. The court recognized that "there is a need by law enforcement personnel for considerable flexibility in how they go

about their investigations, and courts should not intrude into this area." *Id.* at 279-280 (quoting *United States v. Brimage*, 115 F.3d 73, 76 (1st Cir. 1997)). Ultimately, the court found that "the decision not to record a conversation is categorically different from the failure by police to maintain physical evidence" and thus the state did not violate the defendant's due process rights as a matter of law. *Id.* at 280-281.

Here, there is nothing in the record to indicate that "it was clearly established law" that Defendants failure to include Pearson and Thompson's initial denials in their police reports was unconstitutional at the time of the incident. Absent a showing of clearly established law, Defendants are entitled to qualified immunity.

>    B.   Defendants' conduct was objectively reasonable under the circumstances.

Defendants are also entitled to qualified immunity from Plaintiffs' due process claim because they objectively could have reasonably believed that they were not violating Plaintiffs' constitutional rights by not including Pearson and Thompson's off-the-record statements in their police reports. *Higazy v. Templeton*, 505 F.3d 161, 169-170 (2d Cir. 2007) ("even where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful") (internal quotes omitted). Conduct is objectively reasonable for purposes of qualified immunity where officers of reasonable competence could disagree as to whether the

defendant's conduct violated a plaintiff's clearly established constitutional rights. *Malley v. Briggs,* 475 U.S. 335, 344-45 (1986); *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir. 2002). Under this demanding standard, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Briggs,* 475 U.S. at 341; *see also*, *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2017).

### 1. Pearson's Interview

It is essential to appreciate the factual context related to Pearson's interviews, including what the Detectives knew and did not know as their investigation unfolded, and the difficulties they encountered while interviewing witnesses and assessing their credibility to fully understand why Pearson's initial denial was not in their police reports.

Pearson was a convicted felon and drug dealer, who was on probation during the Deli murder investigation. At age 21, when the Detectives interviewed Pearson, he had already been engaged in criminal activity for a decade. Pearson subsequently spent a significant portion of his adult life in prison. Because the Detectives knew Pearson had already lied about talking to Horn at the Deli, when Breland returned to talk to him about the cellphone call, Pearson's reluctance and alleged denial was expected and viewed by the Detectives as a typical knee-jerk response to try to get them to leave him alone. His "denial" must be appreciated in this context.

The district court failed to account for the difficult, real-world task the Defendants confronted by having to sift through Pearson's deception and reluctance to talk, to determine the truth and solve a murder, and how the alleged "denial" is received in the context in which it was received. Breland acknowledged that Pearson initially denied calling Sykes. However, the court failed to appreciate that witnesses, such as Pearson, often initially deny involvement and/or knowledge of a crime. Such initial reluctance is common.

If a witness initially refutes a claim, but then moments later negates that refutation, the initial denial takes on less significance. This is exactly what happened when Defendants initially confronted Pearson about whether he used the stolen cellphone. It is within this context in which the Detectives considered the import of Pearson's initial denial, which they reasonably did not consider exculpatory, but rather simply initial reluctance, which was consistent with his past.

Considering the prevailing case law at the time and full context of the initial denial, it is apparent that omitting Pearson's initial denial from the police report was not unconstitutional. Reasonable officers presented with the same facts and circumstances would label Pearson's initial denial as nothing more than his attempt to avoid being involved with a murder investigation.

## 2. *Thompson's Interview*

Like Pearson, Thompson was on adult probation and already had four to six criminal adjudications as a juvenile when he spoke to the Defendants in 1999. Despite being in the Deli during the crime, he did not call the police. Rather, the Detectives learned of Thompson's identity a few days after the murder when Thompson described the robbery to a friend, who then led the Defendants to Thompson. (A 458).

During the robbery, Thompson had a gun put to his head, was ordered to the floor and threatened. Thompson observed two gunmen, but both were wearing masks covering their entire face except their eyes and mouth, obscuring his ability to identify them.

When the Defendants initially talked to Thompson, he refused to get involved in the investigation. Thompson was scared and did not want to speak to the Defendants. (A 458-59). Thompson's reluctance to talk was not uncommon. However, Thompson was in the Deli and directly involved in the crime, and thus, it was important that he tell the Defendants about the robbery and what he saw.

During his interview, Thompson was shown an array of eight photos that contained Plaintiffs' photos. From the array, Thompson selected Horn's photo because Horn's eyes and mouth in the photo *looked like* the eyes and mouth of the perpetrator that held a gun to his head and ordered him to the ground. Similarly,

42

Thompson picked Jackson's photo from the array. (A 460). Thompson said Jackson's complexion appeared to match the complexion of the perpetrator behind the counter. At Plaintiffs' criminal trial, Thompson testified that he told the Detectives the truth during the interview, namely that ***he could not identify*** Plaintiffs as the Deli robbers.

Twenty years after the Deli homicide, Thompson, for the first time, testified in these cases that he told the Detectives Defendants "about 18 times" he could not identify the perpetrators. (A 220). When asked about Thompson's accusation during his deposition, Breland candidly responded that Thompson initially stated "maybe twice" that he could not identify the offenders. Thompson then described the extent to which he could make "somewhat" of an identification on Horn and Jackson's respective photos.

Like Pearson, witnesses like Thompson – who are threatened at gunpoint, scared and want no involvement in a neighborhood murder investigation – often initially deny involvement and/or knowledge of a crime. A denial in this context is minimized and, thus, not considered exculpatory or impeachment – especially considering Thompson's qualified criminal testimony.

Thompson's uncertain identification was tantamount to saying he could not identify Plaintiffs, but the eyes, mouth and complexion were like those of Horn and Jackson. Defendants interpreted Thompson's comments in the context in which they

43

were given, and reasonable officers presented with the same facts and circumstances would also characterize Thompson's statement as an initial reluctance to get involved with the murder investigation.

## V. Defendants Interview Methods do not Amount to Fabrication of Evidence.

When the Deli investigation is examined through the contemporaneous lens that existed in 1999, as Defendants pieced together the evidence, the record does not support Plaintiffs' claim that Defendants fabricated evidence and manipulated witnesses to convict Plaintiffs. Significantly, the trial court initially found that, as a matter of law, the Detectives did not fabricate evidence. (SPA 104). It later reconsidered this ruling finding that there is an issue of fact as to whether Defendants knew the following statements could be deemed fabricated: (1) Pearson's statement that he made the fourth call (i.e., call to Sykes) using the cell phone; (2) Brown's statement that he handed the phone to Horn after the third call; (3) Detectives' statements that Pearson's account of the fourth call was volunteered by him without threats; (4) Detectives' statements that Brown and Thompson identified the plaintiffs in the course of nonsuggestive photo arrays. (SPA 105-6). The Detectives also interviewed witness Shaquan Pallet. Pallet's interview occurred in the presence of an Assistant State's Attorney. The district court granted summary judgment concerning all claims related to Pallet, including that the Detectives fabricated his statement.

The trial court never decided the issue of qualified immunity as to the fabrication count – specifically how the four aforementioned statements show anything more than inference of negligence in the investigation rather than fabrication. See, *Ferris v. City of Cadillac*, 726 Fed. Appx. 473, 481 (6th Cir. 2018) (qualified immunity on fabrication count as mere inferences of negligence in investigation of child death were not sufficient.) Indeed, the court's initial ruling should be upheld as the evidence is clear that the constitutional violation of fabrication of evidence never occurred as the Defendants were not under a duty to know either that (a) certain facts were false; or (b) their actions were objectively unreasonable.

The Second Circuit has held that government officials "may be held liable for fabricating evidence through false statements and omission that are made knowingly." *Ashley*, 992 F.3d at 139. The Second Circuit has defined "false" as "untrue when made and . . . known to be untrue when made by the person making it or causing it to be made" and "fraudulent" as "falsely made *with intent to deceive*." *Morse v. Fusto*, 804 F.3d 538, 549 (2d Cir. 2015) (emphasis in original). The Second Circuit has held that information may be "false" if material omissions render an otherwise true statement false. *Id.* at 548.

The qualified immunity standard is deliberately "forgiving" to give public officials "breathing room to make reasonable but mistaken judgments" without fear

of disabling liability. *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 1244 (2012) (internal citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

With respect to qualified immunity in the context of interviewing witnesses, the methods used must be "so shocking, brutal, and inhumane that every reasonable police officer would be compelled to recognize that they violated substantive due process," and tactics such as "deceit and fear" do not violate this due process. *Mara*, 921 F.3d at 82. Interrogation methods must be "so brutal and so offensive to human dignity" that they "shoc[k] the conscience." *Chavez v. Martinez*, 538 U.S. 760, 774 (1994) (citing *Rochin v. California*, 342 U.S. 165, 172 (1956).

Each statement shall be addressed in turn.

### A. Pearson's statement that he made the fourth call to Sykes using the cell phone.

An admission is deemed to be coerced when the conduct of the law enforcement officials is such as to overbear the accused's will to resist. *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987). An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials. However, not all psychological tactics are unconstitutional. *Id.* Courts look at the totality of the circumstances concerning whether a defendant's will was overborne including the age, education, and intelligence of the accused, whether the accused

46

has been informed of his constitutional rights, length of the questioning, the repeated and prolonged nature of the questioning, and the use of the physical punishment, such as deprivation of food or sleep. *Id.* Pearson was a drug-dealing, convicted felon, whose admission to making the fourth phone call was not the result of coercion, but rather a self-serving means to deflect blame away from himself and onto Horn.

As discussed in Sections III and IV Defendants' interviews of Pearson were proper and not "so offensive to a civilized system of justice that they must be condemned" nor do any of the circumstances suggest undue influence.

**B. Brown's statement that he handed the phone to Horn after the third call.**

Uncontested facts show that Brown was arrested after his fingerprint matched the latent print lifted from the backroom of the Deli. (A 387). Dease and Adger interviewed Brown who identified Plaintiffs as accomplices. (A 224). Brown testified to such over the course of many years, at Plaintiffs' criminal trial and multiple *habeas* hearings. He has never recanted and never indicated that he was threatened, and his testimony was fabricated. Defendants committed no constitutional violation, and there is no evidence suggesting that Brown's statement was coerced. Notably, Brown testified at Plaintiffs' criminal trial and their habeas trials. (A 412, 416). Brown has never recanted his testimony that Plaintiffs were his accomplices. He has also never claimed he was coerced or that Detectives fabricated his testimony.

47

**C.** **Detectives' statements that Pearson's account of the fourth call was volunteered by him without threats**.

Defendants shall not repeat their arguments discussed at length in sections III and IV above, however, it should not be overlooked that credible evidence exists that caused the Detectives to interview Pearson, and that when they did so, Pearson had a credible basis to implicate Horn. Pearson admitted that he possessed the stolen cell phone, that he knew Skyes, that he sold her drugs, and that he called Sykes to show Horn that he had another girl. Sykes then confirmed that she received a call from Pearson. The investigation and interview methods Defendants utilized to obtain this information were objectively reasonable and did not shock the conscience. There is no established law reflecting otherwise. Defendants were under no duty to disclose references to statements made regarding consequences that Pearson may or may not have faced.

**D.** **Detectives' statements that Brown and Thompson identified the plaintiffs during nonsuggestive photo arrays.**

As discussed in prior sections (III and IV), the interview methods employed by Defendants were not constitutionally unsound. There is no evidence pointing to undue influence with Brown. As to Thompson, as set forth in Section III A, the circumstances do not amount to coercive methods evidencing that Defendants objectively knew that evidence was fabricated. Thompson was always clear as to the limitations of his identification.

Additionally, the constitutionality of Brown and Thompson's identifications were challenged at the trial and appellate courts. (A 357, 389). These challenges were denied and establish that Detectives' conduct and interview methods were not such that every reasonable officer would have known that their non-disclosure was unconstitutional.

## VI. Defendants are Entitled to Qualified Immunity for Failure to Intervene.

Law enforcement officials have an affirmative duty to, "intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley v. Vanbramer*, 945 F.3d 30 (2d Cir. 2019). The theory underlying the claim is, "by failing to intervene," the officer becomes a 'tacit collaborator' in the illegal conduct." *Knighton v. Hartman*, 2023 U.S. Dist. LEXIS 214906, *14-15 (C.D. 2023).

An officer who fails to intervene, "[i]s liable for the preventable harm caused by the actions of other officers, where that officer observes or has reason to know… that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d 552 at 557, citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d. Dist. 1988). For liability to attach, there must have been "realistic opportunity to intervene to prevent harm from occurring." *Id*.

A failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim. *Jeanty v. City of Utica*, 2021 U.S.

Dist. LEXIS 7737, *99-100 (N.D.N.Y. 2021). To establish a failure to intervene claim and to overcome qualified immunity, a plaintiff must show that the officer's failure permitted fellow officers to violate a clearly established constitutional right and it was objectively unreasonable for the officer to believe that his or her fellow officers' conduct did not violate the individual's rights. *Isaac v. City of New York*, 2020 U.S. Dist. LEXIS 60380, *28-29 (E.D.N.Y.) (quoting *Ricciuti v. New York Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997). The same qualified immunity analysis is applied, and if immunity exists for the underlying violation, then immunity also exists for the failure to intervene claim. *Id*.

> A. <u>The Detectives' interview methods and undisclosed statements did not violate clearly established law, and it was objectively reasonable under the circumstances for the Detectives to not intervene in the alleged constitutional violations.</u>

Plaintiffs' claims with respect to the undisclosed *Brady* material are barred by the doctrine of qualified immunity as the Defendants' conduct was objectively reasonable under the circumstances presented. *See Supra*, App. Brief, Sec. III and IV. It was therefore objectively reasonable for the Detectives to believe that they did not have a duty to intervene, as the interview methods did not violate Plaintiffs clearly established constitutional rights. *See Isaac,* 2020 U.S. Dist. LEXIS 60380 at *28-29. It was not clearly established that the initial denials of Pearson (regarding the phone) or Thompson (regarding the identification of Horn or Jackson) were *Brady* material. It was not objectively unreasonable for each Detective to understand

that failing to intervene permitted the other Detective to violate Plaintiffs clearly established constitutional rights. *See Isaac,* 2020 U.S. Dist. LEXIS 60380 at *28-29. Since a failure to intervene claim "is contingent" on the disposition of the claims underlying the failure to intervene, Plaintiffs' failure to intervene claims regarding the interview methods and undisclosed statements also fails.

      B. <u>The Detective Defendants did not have a reasonable opportunity to intervene such that they became tacit collaborators, and a reasonable officer would not have believed failing to intervene was unconstitutional</u>.

Even if the underlying claim claims are not barred by qualified immunity, the Detectives did not have a reasonable opportunity to intervene in the other's respective *Brady* violation with respect to the interviews for Pearson, Thompson, and Brown. For the Detectives to be responsible for failing to intervene, they would need the reasonable opportunity to intervene such that in his failure he became a tacit collaborator in the other's violations. *See Isaac*, 2020 U.S. Dist. LEXIS 60380 at *28-29 (quoting *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016)).

Dease and Breland were not a "tacit collaborator" in the other's alleged unlawful conduct and insufficient evidence supports that either Detective was aware of the other's failure to disclose the interview methods. *See Isaac v. City of New York*, 2020 U.S. Dist. LEXIS 60380 at *28-29. Likewise, there is no evidence that Adger was a "tacit collaborator" in Brown's interview. There is in sufficient evidence that any Detective had a realistic ability to intervene with the actions of

51

another. *See Isaac*, 2020 U.S. Dist. LEXIS 60380 at *28-29 (E.D.N.Y.) (citing *Ying Li*, 246 F. Supp. 3d at 619).

Furthermore, even if a *Brady* violation was found for failure to disclose the methods used in the interviews of Pearson and Thomspon, insufficient evidence exists that either Detective knew the other had not disclosed the interrogation method. *See Anderson*, 17 F.3d 552 at 557 (failure to intervene only occurs where officer observed or had reason to know of a constitutional violation).

A *Brady* violation for suppression of impeachment or exculpatory evidence by the police occurs, "when the government fails to ***turn over evidence*** that is, 'known only to police investigators and not to the prosecutor.'" *Youngblood*, 547 U.S. at 869-70 (citing *Kyles*, 514 U.S. at 438). This requires more than just knowledge of the underlying *Brady* evidence, but rather knowledge of the actual failure of another officer to tender the evidence to the prosecutor. Under these circumstances, a reasonable officer would not have reasonably believed failing to intervene was unconstitutional.

## **CONCLUSION**

For the reasons set forth above the Court should find that Defendants/Appellants Leroy Dease, Petisia Adger, and Daryle Breland are entitled to qualified immunity.

*/s/ Thomas E. Katon*

52

SUSMAN, DUFFY & SEGALOFF, P.C.
700 State Street, Suite 100
New Haven, Connecticut 06511
(203) 624-9830
tkaton@susmanduffy.com

***Attorneys for Defendants-Appellants***

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a). This brief contains 12,125 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen (14) point Time Roman font.

Dated:  October 2, 2024

*/s/ Thomas Katon*
Thomas Katon
***Attorneys for Defendants-Appellants***